Our next case is Seagen v. Daiichi, AstraZeneca, 2023-2024 and 1176. Mr. Sipes. Thank you, Your Honor. May it please the Court, my name is Christopher Sipes and I'm here on behalf of the appellants, Daiichi Sankyo and AstraZeneca. The appeal here from the District Court involves patent claims that were first filed in 2019, 15 years after the 2004 application to which they claimed priority. It is undisputed that they were filed after Seagen learned of the appellants' antibody drug conjugate, Inheritib, and were drafted specifically to capture that product. This Court has made clear, for example, in Quake v. Lowe that- There's nothing inherently wrong with that if they had proper support in the application. That is correct. What this Court said in Quake v. Lowe, however, is that it's particularly important in such cases that the requirements of Section 112 are met. That is, that the application clearly show that it is what the inventors invented and enabled at the time of filing because there is a contrary concern in such circumstances, which is that an old, expansive filing is being used to capture the innovation of others that came later. And that's exactly what is going on here. We have an incredibly broad 2004 application that does not describe the invention later claimed and claims that were then drafted 15 years later to capture not the invention described in 2004, but the invention made later by appellants of Inheritib. So, for example- You've got a jury verdict here, right? We did get a jury verdict, Your Honor, and this Court has not hesitated in prior cases, for example, Nova Zymes and Identix, to enter JMOL after a jury verdict because of a lack of written description in fact circumstances like this, where later claims are added to capture later arising innovation. And in fact, in center court, this Court said, I think correctly, that the Court can look at the specification and on the specification alone, it can be sufficient to show that the jury error in JML should be- Was there substantial evidence supporting jury's verdict on damages? On damages, Your Honor, we believe there is not because the two licenses that were the starting point and the reliance for the damage presentation are not in any way comparable. They weren't non-exclusive. They were worldwide. They covered trade secret and other patents, so that they were the wrong starting point. And this Court has recognized a number of times that the wrong starting point can lead to no substantial evidence. Let me come back to the breadth of the specification here because this Court has emphasized in center court, that that's really the foundation for evaluating written description. The issue for purpose of written description is the linker. The linker is part of the chemical aspect of the antibody drug conjugate that links. Tetrapeptide. That is correct, but not just any tetrapeptide. What is claimed is a narrow subset of 81 tetrapeptides in which- Peptides, of course, are made of amino acids. The specification here discloses the possible use without differentiation of 83 possible amino acids. As the inventor himself admitted, every natural amino acid that I can imagine, as well as a plethora of non-coded amino acids. What is claimed is a linker that is a tetrapeptide made in which each of the four amino acids in the tetrapeptide is either glycine or a phenylalanine. Only technically three of the 83 possibilities because phenylalanine has two isomers in it. That comes to 81. The total number of claimed described peptide linkers in the patent is 108 sextillion. Your point is that they haven't been described. They haven't described the subset. They're possible. Correct. Even within tetrapeptides, what is encompassed by this enormous specification is 47 million tetrapeptides and 108 sextillion peptide linkers. There are 17 illustrative examples of peptide linkers in the patent, 11 dipeptides, 3 tripeptides, and 3 tetrapeptides. None of those peptide linkers are glycine, phenylalanine only, which for the simplest they are referred to as GF only. None of them are GF only. None of the tetrapeptides are GF only. One comes close, right? Going backwards at the P2 position, it's leucine rather than phenylalanine, which is to say it comes close to one of the possible members of the genus. It doesn't come close, of course, to the genus as a whole, but it comes close to one of them. The problem with that is twofold. One, of course, is this isn't horseshoes. Close doesn't count. This Court has been adamant on that, that what matters here is disclosure. You cannot supplement. It's not obvious. Correct. The Court has made this very clear in a number of cases. Dr. Petrosi said something about, you know, I read this back. I see GFLG, and when I see GFLG, I also see GFGG or GFFG. GFFG, correct. There are several problems with her testimony that make it not disclosure, not a blaze mark, if you will, to the genus. The first is, in her words, it would be a straightforward leap, a leap nonetheless. This Court said in Lockwood it is not sufficient that the disclosure, when combined with the knowledge of the art, would lead one to speculate as to modifications that the inventor might have envisioned but failed to disclose. So let's think about what she's saying. She's saying I can see that and then modify it to get to GFFG. She's not saying that a POSA would look at GFLG and recognize the L doesn't mean L, it means F. She's saying you can modify the disclosure. She's saying that a person of ordinary skill would understand what the next step is. That is correct. And the key aspect is it is the next step. And as this Court has made clear in many cases, including most colorfully in its language, Lockwood, next step is not disclosure. It is, in fact, modification of what is disclosed. Of course, having disclosed 107 septillion possibilities and a number of examples, the three tetrapeptides, the other two are very far away, which I'll come to in a minute. One can, after the fact, come up with all sorts of modifications the inventors might have made but did not disclose. What if we were to read the expert testimony, maybe she didn't use the best words, but what if we read her testimony as saying I understand this says GFLG, but I also understand this disclosure ultimately to be contemplating GFFG, because when I look at other examples disclosed of peptides at the P2 position, I see the use of F at the P2 position. And everybody knows because when you read all the relevant journal articles, the value and importance of having phenylalanine at that position. There would be several problems with that. One, of course, is it's still modification. It's still the language of obviousness, but let's move past that. There's two other problems with that. One, of course, is what is claimed here is not the species GFFG, but the genus GRF at position one, GRF at position two, GRF at position three, GRF at position four. It's four choices in a maze-like path. It's not teaching GRF at the first, GRF at the second, GRF at the third, GRF at the fourth. It's identifying a compound. This court has made clear that even if you could have clinical compound, that might not be enough for a subgenus. For example, the BASF case they cited found a species supported but not the subgenus. But also it's worth thinking about that, this idea that somehow the POSA modifies GFLG to be GFFG. You're talking about a person of ordinary skill. A person of ordinary skill. Speaking English. I apologize, Your Honor. A skilled artisan. So what this court said, for example, in the Regence v. Gilead case quite recently, is, you know, when you point to the disclosure of the patent, that the common structural features, which was using a way similar to blazemarks, must exist between a claim and a punitive priority disclosure. Those features must constitute the near entirety of the structures being compared. And in that case, where the priority encompassed a significantly larger genus than what was claimed, it was not sufficient. That's also a flaw with what Dr. Perdozi is suggesting. So if a POSA looks at what's disclosed, first you have to get to tetrapeptides. Because remember, there's also, the disclosure goes from 2 to 12 amino acids. And I think from dipeptides to dodecapeptides, which itself is enormous. But even having made the choice of tetrapeptides, what does the patent teach about limiting choice 1 to G or F? It teaches a way. It teaches G or A, for example, in the three examples. So in your view, what was needed in this disclosure to be said that wasn't said? Do you demand that the spec literally say, by the way, preferred environments are G, F only tetrapeptides for my linker? There needed to be either some sort of disclosure identifying as preferred tetrapeptides over other lengths and glycine and phenylamine other choices, which would be one way to be blazemarks to there. What if it's well known in the art? Again, that's coming back to exactly what this court has repeatedly condemned, for example, in Lockwood. It's not enough for somebody to come in and say, well, because of what's well known, one would modify the disclosure. We're not talking about a case where what we're saying is there's a term used in the application. And that term would be understood by a skilled artisan based on what was known to have the meaning of this. All the time we're coming back to we have to modify what was in the application to come up with the sentence. And this court has repeatedly condemned that. I want to save the rest of your time. I'll continue. I'm happy to reserve the rest of my time. We will save it for you. Thank you. Ms. Horton. Good morning, Your Honors. Sarah Horton for happily with me here today are Dane Sowers and Devin Edwards. After a five-day jury trial with testimony from 19 different witnesses, the jury found that the 039 patent was willfully infringed and not invalid and awarded Seigent a reasonable royalty. Counsel, I realize, we all realize, this is a jury verdict. And written description is a fact question, although enablement isn't. We can look at the specification. We can look at the claim. The claim encompasses a lot of compounds. But it requires the tetrapeptide to be only glycine and phenylalanine. Are there any such descriptions in the patent? If your question, Your Honor, is there literally a description of a GF-only tetrapeptide as one of the examples in the specification? No, that is not listed. So there's no written description of what's claimed? No, Your Honor. I think the written description question looks at how one of ordinary skill in the art would reasonably review the four corners of the specification to understand whether or not the inventors possessed what had claimed. And here I think the evidence that Dr. Bertozzi provided and the jury heard was from the specification itself, actually, that tetrapeptides were claimed specifically, that G and F were two of the amino acids that could be used preferably in those tetrapeptides, and that also there were blaze marks to the specifically claimed tetrapeptide with GF only. Those blaze marks included that of the tetrapeptides that were described specifically in the specification, one of them used G and F for two of the three amino acids. She also explained that the tripeptides that were explained in the specification all used F at the two positions. But that's not what's claimed. She said it would be a straightforward leap. Yes, she did. Well, straightforward sort of calls forth the concept of obviousness. But a leap, a leap means it's not there. I mean, you have to jump. You have to go there. And there's nothing to tell you. There are all sorts of possibilities of tetrapeptides, but there aren't any with just phenylalanine and glycine. Your Honor, I don't think that the court's jurisprudence has required that there be exact identity of the specific claimed species in the written description as it stands. There are other ways to find written description within the four corners. The straightforward leap quote that appellants cite to in their blue brief is, I think, a little bit misread. She explained that the shared specification in 2004 and 2019 disclosed exemplary tetrapeptides with three G and F amino acids, this GFLG sequence that we've heard about, and that it would have been a straightforward leap from that example as to what is claimed in view of the other teachings that are in the patent and what was known in the art. Her choice of language could have been somewhat better. It was a little imprecise. Tell us what the straightforward direction to go to a tetrapeptide with only phenylalanine and glycine. Where is that direction to suggest going? Well, the suggestion is, as we've talked about, is in the specification itself. The specification provides the general chemical formula for the claimed ADC. The specification provides that the peptide linker may be a tetrapeptide. The specification provides that glycine and phenylalanine are two of the 39 potential amino acids that could be used. So that's it, then, the 39? Yes. All right. So, Your Honor, one of the cases that appellant brought up was the BASF case, and if I could analogize to that case for a moment. There, appellants argue that the specification expressly identified canola as preferred embodiment of the invention by listing it as one of other 14 species. So one of 14. Here, the 039 patent likewise discloses GNF as two of the among 39 amino acids suitable for the WWL linker. But we're talking about 47 million possible candidates. Is that right? Well, that's not what's claimed, Your Honor. I know. I know. We're trying to whittle down 47 million to the precious 81 or 83 magic beans here, and I'm trying to figure out how to get there. Your brief at page 62 says that the patent says that GNF are preferred amino acids, and I didn't find that in the patent, and it's a very long patent. So do you have a column in line somewhere in this patent that tells me, that makes it clear that GNF are preferred amino acids when it comes to this peptide linker? So GNF are used in tetrapeptides at column 67. That is where we see the G-N-F-L-G. But is it fair to say that I'm not going to find anywhere in this patent where the patent says, hey, GNF are preferred amino acids for my claimed EDC? Sure. What I think is meant by that, Your Honor, is that GNF are among the two amino acids that are disclosed, right? From there, we have the patent disclosure showing 13 different amino acids. Of those, 39 are used in the 17 exemplary WW units that my friend just discussed. So those 17 exemplary units are made up of 13 different amino acids, not the 39, and there's only 17 in the disclosure itself. In those 17 exemplary WW units, 9 of those are GNF. So really, 9 of the WW units are used. But the question is not whether GNF, I don't use the F, the P for phenylalanine. Only phenylalanine and glycine. That's what's in the claim. Let me move you to enablement. OK. Which is a question of law. Part of the claim talks about the drug moiety being cleaved in a patient. Given the breadth of the claim, and talks about a drug moiety which is rather broad, and the specification really only talks about dolestatins and orostatins, why isn't this an enablement problem to show that that function of being cleaved in a patient has been met? Sure. Well, Your Honor, of course, enablement is a question of law, but the underlying facts are reviewed for substantial evidence. And here the jury heard evidence about why the 039 patent enables one of ordinary skill in the art to practice the intercellular cleavage limitation, which is what I think Your Honor is striving at. The patent actually discloses that the peptide linkers will cleave intercellularly when exposed to proteases present in the tumor cells. That's at column 66, 43 through 46. With any drug? So the patent discloses how that works in certain drugs at column 66. Well, two types of drugs that aren't an issue here. Well, Your Honor, the specification does talk about chemotherapeutic agents in parts of its disclosure, and the prior art also taught numerous methods for testing intercellular cleavage, and whether or not that had occurred. I think the point of the invention is that you could use these amino acid sequences and see that the drug was released inside the cancer cells because the proteases themselves that are inside the cells would break down the linker. That is the point, and that's what the testimony that the – But just to confirm, any time someone created one of these claimed compounds that fits within this claim, you would have to test that manufactured compound to see if it in fact would intercellularly cleave in a patient. Is that right? You wouldn't know ex ante once you've manufactured that antibody drug conjugate whether in fact it does intercellularly cleave in a patient. So I think the issue there is, Your Honor, is that what is cleaving is the linker. So you could test the ADC, sure, but what you're really driving at is whether or not – Whether you would need to test it. Could any scientist making a compound that fits within this claim, after making it say, yes, it's going to definitely meet the intercellular cleaving in a patient limitation? Or would the scientist need to go further and say, okay, now we've got to go test it to see if it works or not? So the disclosure in the invention is that when the claimed linker is used and the claimed intercellular cleavage would follow, there is testimony from the inventors and from the experts on both points. Our evidence shows it's the linker that cleaves when the protase comes into contact with the peptide chain. This is new to me. I did not realize that your position was you didn't need to test. You would know ahead of time. Well, I think the nature of the invention is that one of ordinary skill in the art would know that it was cleaved, and if you wanted to further test – After you tested it. Well, if you tested it, you would find that it did, and there are tests that are – Right, but my question is, do you need to test at all to know that it in fact works? Well, if you – This is where the undue experimentation comes in. Do you need to do this sort of trial and error testing to determine whether the created compound meets the functional limitation of intercellular cleaving? The one of ordinary skill in the art, I think based on reading the specification and understanding the invention, would understand that the cleavage would occur based on how the compound is structured, but if testing were necessary to determine the cleavage, then the method for doing so would know. Where is that testimony in the record where your expert said, no testing required, the spec tells me all I need, any time I make one of these conjugates that falls within the claim, it's definitely going to intracellularly cleave without me needing to do any testing on it? Your Honor, I don't know that that exact testimony is there, but I'll point you to two places. One is in the patent itself at column 66, 43 to 45, where the patent speaks generally about how protases will break apart the linkers in the cell. It says the amino acid unit can be enzymatically cleaved by one or more enzymes, including tumor-associated protase to liberate the drug unit. Dr. Bortosi similarly testified at Apex 3141 that protases are enzymes that cut peptides. I often like to think of them as acting... Your view is of column 66, every single one of the contemplated amino acid units in these two columns here will do the intracellular cleaving? There would be at least... I don't know, where were we, like a sextra trillion or something like that? Well, of the claims, so look, in enablement we're looking at what is actually claimed, and I think that what is claimed is... The laundry list of possible variations on an amino acid sequence is telling us that, yes, they all will do the cleaving. Look, I think that the inventors... So that gets us out of 47 million and all the way up to that very large unpronounceable number. Well, what the jury heard testimony was was enablement of the claim itself, which was the GF-only tetrapeptide linker. Why isn't this case governed by Amgen, where the Supreme Court unanimously affirmed us on enablement of a claim that had a functional aspect to it and said you can't be sure without undue experimentation that this function would be enabled? Your Honor, I think Amgen is... This case does not squarely fit into the facts of Amgen. In Amgen, the Supreme Court found that the claims were defined by their function. It sought to monopolize every antibody with a certain property, and the only way to know if an antibody would bind to the enzyme was to create candidates and then to screen them. Amgen had no structural limitations to narrow the claims at all, but here... But there's an important function here, the claim in a patient. There is a function here, the intercellular cleavage. You can't do it in vitro in a patient. Well, I think there is testimony on that as well in the record that the jury heard, but the 039 patent does not claim every ADC that binds to a tumor cell and cleaves intercellularly. If it did, that is more like Amgen. Here we have claims to ADCs with a particular chemical structure. The particular chemical structure has, according to the math of appellants, one of 81 possible tetrapeptide linkers. That is not an unknowable, unlimited universe of compounds. How many drug moieties are covered by this claim? I think the testimony below was that it could cover any drug moiety. Okay. So I'm just trying to get a grip in my mind as to what's the number of possible candidates overall that are covered by this claim. Is it just a couple hundred or is it a couple hundred thousand? Or is it in the millions? I don't know that the number was part of the testimony or is below, but the specification discusses many drug moieties. There are drug moieties discussed at trial, and the specification does not so limit the drug moieties to any specific number. Okay. So it covers any drug moiety. Correct. Thank you, Counsel. Thank you. Mr. Sipes has some letters on. Thank you. Your Honor, let me pick up first enablement, and then I have a few comments on written description. On enablement, the idea that no testing is required is rather a new argument to me. We've not heard it before. If you look, for example, on page 56 of the red brief, of their brief, it discusses that one is skill in the art, that there existed numerous in vivo and in vitro assays that could be used to test for intracellular cleavage. The notion that a skilled artisan would simply know that all would work, I think is both contrary to the record, which suggests that not all will work, and contrary to how one would determine whether it's cleaved through testing. And let me point you to that record evidence. First, with regard to the question of whether they all work, Dr. Klein was asking that question, and there's no one linker that will work for every drug? Answer, there is no one linker that will work for every drug. How would one know? Again, Dr. Klein, one of the inventors, says, and I apologize, that was at Appendix 3297, 7913-15, and then at Appendix 3296, 7821-791, he testifies that you would need to do an assay to determine you don't know until you do the assay. The jury necessarily must have found that there was no undue experimentation here. So why can we take that away from them? Because Amgen and Vexalta makes clear that where the patent has a functional requirement that requires iterative trial and error over the course of, in Wythe and Cordes it was tens of thousands, in Amgen it was millions, in Vexalta it's millions, here it's actually millions of millions, because you have millions of possible drug moieties and millions of possible antibodies. I didn't see any testimony on that. Where is it? Your Honor, I believe there is testimony, although I apologize that I do not have it to hand, both from Dr. Lambert, both that there are millions of possible antibodies and drugs. But what is clear, and it was actually CIGENT who sought this construction, neither drug moiety nor antibody is limited to any particular antibody or any particular drug. So it covers any antibody targeting any particular cell and any drug. And with regard to the idea that anyone uses it, that's not what the patent teaches. If you look, for example, at column 67, 57 to 59, the patent just teaches useful linker units, WW being the linker unit, useful linker units can be designed and optimized in their selectivity for enzymatic cleavage by a particular enzyme, for example, a tumor-associated protease. So the patent is not teaching just use anyone. It's saying you have to design your linker specific to the particular target cell. And again, because you have multiple, any possible antibody could be any possible cell. So it does not teach that anyone could be used. Turning to, and so that's exactly Amgen and Bexalta, where again, in the face of a jury verdict, the fact that the patent claim was so broad and required iterative trial and error to determine the functional limitation. Do you have a final thought? Yes. Very quickly, for written description, Your Honor, that point that they're now making, that you could use any peptide linker, anyone at all, and they say that the patent suggests you could use any linker, that defeats blazemarks. As the Court said in Ruchig, it is no help in finding a trail or in finding one's way through the woods where the trails have disappeared to be confronted simply by a large number of unmarked trees. If they're right that the patent teaches you could use any, any linker, then there is no blazemark. Thank you, counsel. The case is submitted.